# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**REDPRAIRIE CORPORATION,**

      Plaintiff,

      v.                         Case No. 05-C-1072

**JEROME'S FURNITURE WAREHOUSE,**

      Defendant.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

On October 7, 2005, RedPrairie Corporation ("RedPrairie") filed a complaint alleging that Jerome's Furniture Warehouse ("Jerome's") breached a contract regarding payment for software that RedPrairie created for Jerome's. In addition to the breach of contract cause of action, RedPrairie alleged unjust enrichment. On November 28, 2005, Jerome's answered the complaint and filed a counterclaim for intentional misrepresentation, strict misrepresentation, breach of contract, breach of an oral contract, breach of the covenant of good faith, and rescission. On April 10, 2006, RedPrairie filed a motion to amend its complaint to add a third cause of action for tortuous interference with current and prospective business relationships, which the court granted on April 19, 2006. On February 16, 2007, Jerome's and RedPrairie both filed motions for summary judgment. On February 27, 2007, the parties filed a stipulation seeking the dismissal of Jerome's causes of action for breach of contract, breach of an oral contract, and breach of the covenant of good faith, which the court granted. The pleadings on the parties' motions are closed and the matters are ready for resolution. The parties have previously consented to the full jurisdiction of a magistrate judge.

**FACTS**

Jerome's is a furniture retailer doing business in southern California. In 2004, Jerome's realized that its inventory computer system, known as Universe, was unreliable in that it would spontaneously generate inaccurate inventory numbers so that Jerome's did not know what items it actually had in stock. (Docket No. 78 at 6.) Jerome's efforts to fix its computer problems proved unsuccessful, and therefore it decided to develop a new "enterprise resource planning program" ("ERP") based upon a system known as Compiere. (Docket No. 78 at 7.) Early efforts to get the new Compiere-based system to work along side Universe proved unsuccessful. (Docket No. 78 at 8.)

At this time, RedPrairie, a software corporation that develops inventory software for the retail furniture industry, contacted Jerome's and stated that it was developing a Compiere-based ERP. (Docket No. 78 at 9.) RedPrairie further discussed selling to Jerome's a warehouse management system ("WMS") known as Dispatcher. (Docket No. 78 at 9.)

On March 30, 2005, the parties met in San Diego and Jerome's stated that its Universe system was failing and Jerome's wanted to replace it with a Compiere-based ERP. (Docket No. 78 at 9.) RedPrairie stated that it was developing a Compiere-based ERP with another of its customers, (Docket No. 78 at 9), and as part of its sales-pitch, RedPrairie discussed the possibility of Jerome's cooperating with RedPrairie's other customer in a joint venture in the development of the ERP (Docket No. 78 at 10). Also during this meeting, Jerome's asked RedPrairie if GERS, a competitor of RedPrairie who also sells an ERP for the furniture industry, had a warehouse management system. (Docket No. 78 at 11.) RedPrairie said that GERS did not have a product that could handle a company of Jerome's size. (Docket No. 78 at 11.)

Jerome's was excited about the prospect of purchasing an ERP and WMS bundled together and sought to quickly move forward on the project. (Docket No. 78 at 11.) However, RedPrairie's

2

ERP was actually only in the earliest stages of development, and thus RedPrairie's intent was to sell Jerome's Dispatcher without the ERP. (Docket No. 78 at 13.) Jerome's, however, continued to believe that Dispatcher was just a part of a total solution from RedPrairie that would include a new Compiere-based ERP. (Docket No. 78 at 13-14.) Jerome's sought to replace its Universe system whereas RedPrairie intended to use the Universe system as the foundation for the Dispatcher system. Jerome's did not consider this to be a viable option because the Universe system was barely functioning on its own and thus would be unable to handle the additional burden of supporting the new Dispatcher system.

On April 28, 2005, Jerome's signed a software license and service agreement ("SLA") that related to the Dispatcher system. (Docket No. 78 at 14.) It was not until about two weeks later, on May 12, 2005, when Jerome's received the functional specs that it became clear to Jerome's that RedPrairie intended to sell it the Dispatcher system without a corresponding ERP. (Docket No. 78 at 14.) Jerome's initially put the project on hold and began looking for another ERP. (Docket No. 78 at 16.) In attempting to locate a new ERP, Jerome's learns that GERS offers an integrated system that includes an ERP and WMS that is sufficient for Jerome's needs. (Docket No. 78 at 17.) In response, RedPrairie offered to develop a Compiere-based ERP for $1.2 million, a price that was more than three times as much as GERS' product. (Docket No. 78 at 17.) At this time, Jerome's cancelled Dispatcher and decided to go with the GERS product. (Docket No. 78 at 17.)

**SUMMARY JUDGMENT STANDARD**

A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). As provided under Rule 56(c), only "genuine" issues of "material" fact will defeat an otherwise "proper" motion for summary judgment. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Material facts are those facts which, under the governing substantive law, might affect the outcome

of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id.

The movant bears the burden to establish that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); see also Celotex Corp., 477 U.S. at 323. The moving party satisfies its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson, 477 U.S. at 255; Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988); Spring v. Sheboygan Area School Dist., 865 F.2d 883, 886 (7th Cir. 1989). Further, "on summary judgment, a court can neither make a credibility determination nor choose between competing interests." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir. 1993).

If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

This case comes before the court on diversity jurisdiction pursuant to 28 U.S.C. § 1332, and thus this court is required to apply state substantive law. Lexington Ins. Co. v. Rugg & Knopp, Inc., 165 F.3d 1087 (7th Cir. 1999). Wisconsin law applies in the present case, and therefore this court must attempt to predict how the Wisconsin Supreme Court would decide the issues presented here. Id. (citing Allen v. TransAmerica Ins. Co., 128 F.3d 462, 466 (7th Cir. 1997)). "Where the state supreme court has not ruled on an issue, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." Id. "In the absence of Wisconsin authority, [a federal court] may consider decisions from other jurisdictions." Id. (citing Valerio v. Home Ins. Co., 80 F.3d 226, 228 (7th Cir. 1996)).

## ANALYSIS

### Existence of a Contract

The threshold dispute raised by the parties in their respective motions for summary judgment is whether a contract was formed. Jerome's argues that the SLA was too indefinite to constitute a binding contract because it referred to and relied upon the yet-to-be-agreed upon functional specs. Therefore, the SLA was merely an agreement to agree. RedPrairie, however, argues that the SLA was sufficiently definite to constitute a binding contract even though the parties had not agreed to the functional specs, because the functional specs were not an essential contract term.

Under Wisconsin law, "ordinarily a contract must be definite and certain as to its basic terms and requirements to be enforceable." Herder Hallmark Consultants, Inc. v. Regnier Consulting Group, Inc., 2004 WI App 134, ¶8, 275 Wis. 2d 349, 685 N.W.2d 564 (2004) (citing Petersen v. Pilgrim Vill., 256 Wis. 621, 624, 42 N.W.2d 273 (1950)); see also Metro. Ventures, LLC v. GEA Assocs., 2006 WI 71, ¶22, 291 Wis. 2d 393, 717 N.W.2d 58 (quoting Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co., 206 Wis. 2d 158, 178, 557 N.W.2d 67 (1996). A contract is enforceable even if there was not an actual "meeting of the minds;" rather, the court will "give effect to the parties' intent to contract if such intent is discernible from their conduct or the contract language." Herder, 2004 WI App 134, ¶8. "When there is evidence that two parties intended to enter into the contract, 'the trier of fact should not frustrate their intentions, but rather should attach a 'sufficiently definite meaning' to the contract language if possible.'" Metro. Ventures, 2006 WI 71, ¶25 (quoting Management Computer, 206 Wis. 2d at 179, 557 N.W.2d at 76). "Thus, [a court] may discern a contract where the parties' conduct evidences sufficient definiteness of an intent to contract, even if an essential term is left vague or indefinite." Herder, at ¶10. For a court to reject an alleged contract on the basis of indefiniteness, the "[i]ndefiniteness

must reach the point where construction becomes futile." Id. (quoting Management Computer Servs. v. Hawkins, Ash, Baptie & Co., 206 Wis. 2d 158, 180, 557 N.W.2d 67, 76 (Wis. 1996) (in turn quoting Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., 232 N.Y. 112, 133 N.E. 370, 371 (1921) (Cardozo, J.))).

Jerome's relies heavily upon Matrinson v. Brooks Equipment Leasing, Inc., 36 Wis. 2d 209, 152 N.W.2d 849 (1967), where the Wisconsin Supreme Court held a contract may incorporate by reference a document not yet in existence at the time that the contract was signed. However, to bind a party, the subsequently created document must be sufficiently identified in the original contract and there must be "some form of adoption by the person sought to be charged with performance." Id. at 217, 52 N.W.2d at 853.

The dispute in Matrinson involved a contract for the construction of a pool. Prior to signing the contract, the purchaser saw the construction company's proposed plans and it was on this basis that the purchaser entered into the contract. The contract established a price for the project but stated that the specific plans for the pool would be submitted later by the construction company. A dispute arose when the construction company sought additional payment for a filter system that it regarded as an extra and not covered under the original contract price; the purchaser argued that the proposed plans included such a filter system and thus it was included in the contract price. The court determined that the parties' actions under the contract clearly established that the particular filter system was not an extra and therefore granted summary judgment in favor of the purchaser.

Relying upon this precedent, Jerome's argues that because it did not adopt the functional specs, there was no contract. However, Matrinson is distinguishable from the present case. The question presented to this court is whether an original contract is enforceable in the absence of the parties subsequently adopting a yet-undrafted document that is referred to in the original contract? This was not the question presented to the Wisconsin Supreme Court in Matrinson; the court did not

6

hold that subsequent adoption was required for the original document to be enforceable by itself. Matrinson stands for the proposition that if a party took some action to adopt the functional specs, it could be bound by the terms of the contract; Matrinson does not answer the question of whether an original contract can be binding upon the parties in the absence of mutual adoption of the subsequently-created document.

It is undisputed that Jerome's never agreed to the functional specs. Therefore, the question before this court is whether the SLA, by itself, was sufficiently definite so as to constitute an enforceable contract? Although the functional specs certainly clarified and defined in greater detail the parties' respective obligations, the court nonetheless concludes that the SLA sufficiently set forth the bounds of the agreement, and thus constitutes an enforceable contract.

"A court cannot enforce a contract unless it can determine what it is." Shetney v. Shetney, 49 Wis. 2d 26, 38, 181 N.W.2d 516, 522 (1970) (quoting 1 Corbin, *Contracts*, § 95.) With respect to the SLA, the court has no trouble discerning what the SLA was intended to accomplish. In its most basic terms, the SLA was an agreement for RedPrairie to sell, and in turn for Jerome's to purchase, Dispatcher at a cost of $289,850. However, the SLA did substantially more than that in setting forth the respective duties of the parties. The detailed nineteen-page document sets forth, for example, the scope of the license agreement, Jerome's rights in the use of the software and obligations to protect it, RedPrairie's warranty of Dispatcher, the terms of payment, and the parties' rights regarding terminating the agreement. (Docket No. 80-13.) There are also additional portions that set out in detail the costs and fees that Jerome's shall be responsible for, (Docket No. 80-13 at 12-13), and four pages that describe which party will be responsible for certain tasks, (Docket No. 80-13 at 16-20).

The SLA repeatedly states that the price is dependent upon the assumptions set forth in the functional specs. Jerome's argues that the SLA could not be considered an enforceable contract

7

absent the parties' agreement on the functional specs because doing so would empower RedPrairie to unilaterally and dramatically reshape the scope of the bargain based upon whatever assumptions it chose to set forth in the functional specs. The court is not persuaded by this argument. Although the SLA states that the fixed price may change if the assumptions in the functional specs proved to be inaccurate, such contingencies are commonplace in complex contracts for the services or goods. Further, a duty of good faith is inherent in any contract. <u>Metro. Ventures, LLC v. GEA Assocs.</u>, 2006 WI 71, ¶35, 291 Wis. 2d 393, 717 N.W.2d 58. Thus, if RedPrairie was alleged to have unilaterally reshaped the bargain by fundamentally altering the assumptions upon which both of the parties had relied in agreeing to the SLA, Jerome's would not find itself bound to a contract without a remedy; rather, it would be able to allege a breach of the duty of good faith. Not only is a duty of good faith implied between parties to a contract; the SLA specifically incorporates this. For example, section 5.1 provides that the parties "will mutually develop and approve a Project Plan in connection with the services to be provided pursuant to this Agreement."

Furthermore, if Jerome's was exceptionally concerned about the uncertainty of how Dispatcher would be interfaced with Universe, its option was to not sign the SLA until it had the opportunity to review and approve the functional specs. However, rather than taking this approach, for whatever reason, Jerome's elected to agree to the SLA and in doing so bound itself to the contract terms set forth in that agreement.

Jerome's further argues that the SLA does not constitute a contract largely because it failed to disclose two points: (1) that Dispatcher will be used in conjunction with Universe and RedPrairie will not be providing a new ERP; and (2) that Jerome's will be responsible for designing interfaces between Dispatcher and Universe. Jerome's argues that these facts were not clear until it received the functional specs.

However, the SLA is clear that it relates only to Dispatcher; there is no reference or allusion to RedPrairie providing an additional ERP. In the absence of a provision specifically obligating RedPrairie to provide an ERP in addition to Dispatcher, the SLA makes clear that Jerome's is required to provide all software and hardware necessary to utilize Dispatcher. (Docket No. 80-13 at 4.)

The only reference to a new host is in the statement of work where it is stated that "[a]ny additional work to interface to a new host is not included." (Docket No. 80-13 at 17.) Also in the statement of work section, the SLA makes clear that Jerome's is responsible for developing the interfaces between Dispatcher and Universe. (Docket No. 80-13 at 17.) Although Jerome's argues that this provision simply required Jerome's to develop a temporary interface to permit the transfer of Jerome's current data, rather than the interfaces that would be necessary to permit Dispatcher to permanently work with Universe, this misunderstanding or dispute is not material to the question of whether the SLA was sufficiently definite to constitute a binding contract; the SLA is clear that the responsibility of developing the requisite interfaces is allocated to Jerome's.

Although it certainly would have been far more efficient and less problematic if the functional specs were agreed to prior to the parties entering into the SLA, despite the fact that the functional specs were never agreed to, the SLA, standing alone, is sufficiently definite as to the essential terms regarding the responsibilities of the parties so as to constitute a binding contract. As a binding contract, Jerome's was bound to abide by the termination procedures set forth in the SLA. (See Docket No. 80-13 at 9.) It is undisputed that Jerome's failed to abide by the SLA's termination provisions. Jerome's never gave RedPrairie any written termination notice, nor did Jerome's identify or allow RedPrairie an opportunity to cure any material breach, all of which were required by section 14.1 of the SLA. (Docket Nos. 85 at 15 ¶ 57; 100 at 22 ¶ 57.) Therefore, by unilaterally cancelling the contract, Jerome's failed to comply with section 14.1 of the SLA.

**Misrepresentation**

Jerome's has alleged various forms of misrepresentation both as an affirmative defense to RedPrairie's contract claims, (Docket No. 36 at 6, ¶8), and as a cause of action in its counterclaim, (Docket No. 36 at 11-13, ¶¶17-34). Jerome's alleges that RedPrairie made a series of misrepresentations to cause Jerome's to believe that RedPrairie was developing an ERP and that it was possible to do a joint venture between Jerome's and one of RedPrairie's other customers as part of an overall solution for Jerome's needs. (Docket No. 99 at 18.) Jerome's further alleges that RedPrairie misrepresented that other competing software companies did not have warehouse products that would meet Jerome's needs. (Docket No. 99 at 18-19.)

RedPrairie argues that it is entitled to summary judgment on Jerome's misrepresentation claims for a variety of reasons, including the representations were true, Jerome's reliance was unreasonable, the false information was not material, or the representation did not relate to a fact. (Docket No. 84 at 19.) More importantly, RedPrairie points to a clause in the SLA which states in capital letters, "THERE ARE NO REPRESENTATIONS, PROMISES, WARRANTIES OR UNDERSTANDINGS RELIED UPON BY CUSTOMER THAT ARE NOT CONTAINED HEREIN." (Docket No. 80-13 at 10, ¶15.1.)

Such non-reliance or integration clauses are common in commercial transactions and courts have repeatedly held that such clauses preclude parties from alleging reliance upon representations not contained in the contract. See, e.g., Cerabio LLC v. Wright Med. Tech., Inc., 410 F.3d 981, 991-92 (7th Cir. 2005) (applying Delaware law and holding such a non-reliance clause precluded a party from asserting reliance upon alleged representations when the parties were sophisticated, assisted by legal counsel, and the clause was included in a carefully negotiated contract and after months of extensive due diligence); Rissman v. Rissman, 213 F.3d 381, 383-85 (7th Cir. 2000) (holding that a non-reliance clause in a stock purchase agreement precluded a party from alleging reliance upon a

prior oral statement); Mallow v. Hall, 209 Wis. 426, 429, 245 N.W. 90, 91 (1932) (holding that the statement, "There is no understanding, verbal or otherwise, which is not set down herein," precluded a party from utilizing parol evidence to prove the existence of a warranty.)

"The general rule is that when a contract includes an integration clause, evidence of contemporaneous or prior oral agreements relating to the same subject matter are not admissible." Peterson v. Cornerstone Prop. Dev., LLC, 2006 WI App 132, ¶31, 294 Wis. 2d 800, 720 N.W.2d 716 (citing Matthew v. American Family Mut. Ins. Co., 54 Wis. 2d 336, 341-42, 195 N.W.2d 611 (1972)). However, "Wisconsin follows the general rule that integration clauses which negate the existence of any representations not incorporated into the contract may not be used to escape liability for the misrepresentations." Grube v. Daun, 173 Wis. 2d 30, 59-60, 496 N.W.2d 106, 117 (Ct. App. 1992) (citing Anderson v. Tri-State Home Improvement Co., 268 Wis. 455, 459, 67 N.W.2d 853, 856-57 (1955)). An integration clause may be utilized to avoid liability under tort law only if the clause "is specific as to the tort it wishes to disclaim." Id. at 60, 496 N.W.2d at 117. A court will not find that a tort is barred by an integration clause in a contract unless it is apparent that it was a result of express bargaining between the parties that the possibility of tort recovery was given up. Phillips Petroleum Co. v. Bucyrus-Erie Co., 131 Wis. 2d 21, 33, 388 N.W.2d 584, 589 (1986).

In Grube, 173 Wis. 2d 30, 496 N.W.2d 106, the court held that an "as is" clause in a contract was insufficient to preclude an action by a buyer for misrepresentation against a seller and a real estate broker for the defendants' alleged affirmative misrepresentations regarding the fitness of the property. Grube, 173 Wis. 2d at 62-63., 496 N.W.2d at 118. However, the "as is" clause precluded claims for breach of warranty and misrepresentation by non-disclosure. Id.

11

In <u>Peterson</u>, 2006 WI App 132, 294 Wis. 2d 800, 720 N.W.2d 716, the court distinguished <u>Grube</u>, and held that an integration clause precluded a buyer from alleging misrepresentation by the seller when the contract included three separate integration clauses, stating:

> This Offer, including any amendments to it, contains the entire agreement of the Buyer and Seller regarding the transaction. All prior negotiations and discussion have been merged into this Offer [. . .] Seller has made no representations other than written in this offer and attached documents concerning the property. . . . The Buyer acknowledges, subject to the Limited Warranty contained in Exhibit E … (c) other than those written representations concerning the condition of the Property contained in the Condominium Offer to purchase, including the Exhibits annexed thereto, she has not relied on any representations made by the Seller in entering into the Condominium Offer to Purchase.

<u>Id.</u> at ¶37 (emphasis omitted). The court noted that this specific and detailed integration clause was quite different from the general "as is" integration clause at issue in <u>Grube</u>. <u>Id.</u>

The SLA was the product of negotiation on the part of sophisticated parties, both of whom were represented by counsel. The integration clause at issue in the present case clearly states that there are no representations relied upon by Jerome's other than those contained in the SLA. Therefore, like the court in <u>Peterson</u>, this court finds that the integration clause in the SLA was sufficiently clear and there is no reason to not give the integration clause its intended effect. <u>Id.</u> Thus, the court concludes that Jerome's claims in tort for misrepresentation are barred by the SLA's integration clause and the court shall grant RedPrairie's motion for summary judgment as to these claims.

**Damages**

Under the SLA, the maximum damages recoverable for a party's breach of the SLA are limited to the amount that would have been paid for Dispatcher, (Docket No. 80-13 at 9, ¶13.3), i.e. $289,850, (Docket No. 80-13 at 12, ¶2). RedPrairie argues that by Jerome's breaching the SLA, RedPrairie was denied the benefit of the bargain, specifically the lost profit on its sale of Dispatcher. RedPrairie alleges that the entire license fee of $289,850 would have been profit to

12

RedPrairie because Dispatcher was an established product and its costs of development were written off long ago. The only expense it had related to its sale was a 5% commission to the lead salesperson on the deal. RedPrairie also alleges that it would have received profits on related products and services that it would have provided to Jerome's under the contract and thus its damages exceed the $289,850 cap and it is therefore entitled to recover this amount of damages.

Jerome's argues that RedPrairie's evidence regarding damages is not undisputed, specifically in that RedPrairie's witness regarding damages lacks the qualifications to make the determinations he did, and Jerome's disputes the theories this witness utilized to calculate damages. Further, Jerome's notes that RedPrairie's assertion that its only costs related to the sale of Dispatcher to Jerome's was a sales commission is inconsistent with RedPrairie's response to interrogatories where it states that it had expended 325 hours adapting Dispatcher for Jerome's. (Docket No. 105-12 at 3.).

RedPrairie's calculations regarding its lost profits are based upon the declaration of Todd Clauer ("Clauer"), RedPrairie's Chief Accounting Officer. (See Docket No. 87.) Although Clauer was not disclosed as an expert, RedPrairie asserts that the conclusions of its expert, Ron Bero, were based upon Clauer's information, and thus, RedPrairie sought to rely upon Clauer's declaration in an effort to avoid costs related to further utilizing its expert. (Docket No. 121 at 7-8.)

The present state of the record precludes the court from ascertaining damages on summary judgment. For one thing, RedPrairie does not offer an explanation regarding the apparent expenditure of 325 hours related to its proposed sale of Dispatcher. Thus, this is a dispute of material fact regarding the calculation of damages that precludes the court from granting the plaintiff's motion for summary judgment.

Next, there exists a dispute of material fact with regards to the more substantial issue of whether it is appropriate for RedPrairie to consider Dispatcher's entire sale price as profit. The

13

propriety of the expert's method of accounting is subject to dispute. Although Jerome's does not present its own expert to refute RedPrairie's method of calculating damages, Jerome's is not required to do so. Should this matter come to trial, it may proceed entirely by cross-examining RedPrairie's expert.

RedPrairie also points to the fixed fee for services of $290,520 that was contained in the SLA. (Docket No. 80-13 at 13, 5.) RedPrairie alleges that its average costs for providing such services from 2004 through 2006 was 77%, and thus RedPrairie would have realized a profit of $66,819.60 on this fixed fee for services. RedPrairie also points to the fact that it expected to earn additional revenue for support services provided after the conclusion of the agreement, but RedPrairie does not offer any evidence as to what these additional sums may be. Further, there is a dispute of material fact as to whether RedPrairie took reasonable steps to mitigate these damages, (see Docket No. 36 at 6, ¶5). For the foregoing reasons, summary judgment as to RedPrairie's request for damages for Jerome's breach of the SLA is inappropriate.

**Unjust Enrichment**

"[A] claim of unjust enrichment does not arise out of an agreement entered into by the parties. Rather, an action for recovery based upon unjust enrichment is grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust." Watts v. Watts, 137 Wis. 2d 506, 530, 405 N.W.2d 303, 313 (1987) (citing Puttkammer v. Minth, 83 Wis. 2d 686, 689, 266 N.W.2d 361, 363 (1978)). "It is not enough to establish that a benefit was conferred and retained; the retention must be inequitable." Puttkammer, 83 Wis. 2d at 689, 266 N.W.2d at 363.

> The elements of such a cause of action are: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under circumstances making it inequitable for the defendant to retain the benefit without payment of its value.

Id. at 688-689, 266 N.W.2d at 363 (citing S & M Rotogravure Service, Inc. v. Baer, 77 Wis. 2d 454, 460, 252 N.W.2d 913 (1977); Seegers v. Sprague, 70 Wis. 2d 997, 1004, 236 N.W.2d 227 (1975); Gebhardt Bros., Inc. v. Brimmel, 31 Wis. 2d 581, 584, 143 N.W.2d 479 (1966); Don Ganser & Assos., Inc. v. MHI, Inc., 31 Wis. 2d 212, 217, 142 N.W.2d 781 (1966); Kelley Lumber Co. v. Woelfel, 1 Wis. 2d 390, 83 N.W.2d 872 (1957); Nelson v. Preston, 262 Wis. 547, 55 N.W.2d 918 (1952)).

It appears that RedPrairie's claim for unjust enrichment is mooted by this court concluding that the SLA constituted an enforceable contract between the parties. To the extent that RedPrairie's claim is not moot, disputes of material fact preclude the court from granting the plaintiff's motion for summary judgment.

RedPrairie alleges that Jerome's received the benefit of "some project management services" and therefore RedPrairie should be equitably compensated. (Docket No. 108 at 10.) Jerome's argues that any project management services it received did not benefit Jerome's in any meaningful way. Jerome's concedes that it received three days of training on Dispatcher and various other services related to the proposed sale of Dispatcher. (Docket No. 135 at 16.) However, Jerome's argues that RedPrairie fails to present any facts as to how these services may have resulted in a benefit to Jerome's. (Id.)

Whether or not the training that Jerome's undisputedly received was valuable to Jerome's is a dispute of material fact. Therefore, the court shall deny Jerome's motion for summary judgment as to RedPrairie's unjust enrichment claim, but will inquire of RedPrairie whether this claim is still viable.

### Tortious Interference

To prevail on a tortious interference claim under Wisconsin law, a plaintiff must satisfy five elements: (1) an actual or prospective contract existed between the plaintiff and a third party; (2) the defendant interfered with that contract or

15

prospective contract; (3) the interference was intentional; (4) the interference caused the plaintiff to sustain damages; and (5) the defendant was not justified or privileged to interfere.

Shank v. William R. Hague, Inc., 192 F.3d 675, 681 (7th Cir. 1999).

RedPrairie alleges that Jerome's tortiously interfered with its relationships with other current and prospective customers when Jerome's president emailed outside consultants and "referred to RedPrairie as 'pure hardball people' who were 'smug' 'bull[ies]' and stated that Jerome's 'need[ed] to go public in the industry press,' [and] 'If you can convince them that one lost client because of bad will in the industry [sic], we may have a chance for a reasonable settlement.'" (Docket No. 108 at 11.) RedPrairie admits that it is not aware of any customers or prospective customers that it lost as a result of Jerome's alleged interference. (Docket No. 107 at 23, ¶57.) Further, RedPrairie admits that it is not aware of any "substantial damage" it has received as a result of Jerome's alleged interference. (Docket No. 107 at 23, ¶58.) However, RedPrairie alleges that it suffered nominal damages as a result of the time and resources expended "contacting and reassuring customers to mitigate the harm cause by Jerome's inference." (Docket No. 108 at 12.) RedPrairie acknowledges that its damages are less than the cost of litigating this claim and that it brought this claim in its amended complaint primarily as a means to prevent Jerome's from continuing to engage in this behavior. (Docket No. 108 at 12.) Therefore, RedPrairie states that it intends to move to dismiss this claim without prejudice at the close of this litigation but nonetheless urges the court not to dismiss the claim at this point. (Docket No. 108.)

Jerome's argues that RedPrairie fails to present sufficient facts to sustain its claim. Particularly, Jerome's argues that RedPrairie is unable to demonstrate that it suffered damages and that RedPrairie's admission that it is unaware of any current or prospective customers lost precludes RedPrairie's action. (Docket No. 135 at 17.)

Actual interference is an element of the tort. RedPrairie presents evidence to indicate that it was afraid that Jerome's *might* interfere with its current or prospective contractual relationships and therefore undertook efforts to reassure its customers. Although these efforts of reassurance likely resulted in some expense to RedPrairie, these expenses were not the result of any interference with a contract on the part of Jerome's. RedPrairie fails to present any evidence, or even an allegation, that any current or prospective contractual relationship was harmed by any action on the part of Jerome's. Therefore, the court shall grant Jerome's motion for summary judgment as to RedPrairie's claim for interference with contract.

**IT IS THEREFORE ORDERED** that RedPrairie's motion for summary judgment, (Docket No. 83), is **granted in part and denied in part**. The court grants RedPrairie's motion regarding the existence of a contract; the SLA is a valid contract that is binding upon the parties, and Jerome's breached the contract by prematurely and unilaterally terminating it without complying with the contract's termination provisions. Further, the court grants RedPrairie's motion regarding dismissal of Jerome's tort claims for misrepresentation. However, there is a dispute of material fact regarding damages, and therefore, RedPrairie's motion for summary judgment with respect to damaged under the contract is **denied**.

**IT IS FURTHER ORDERED** that Jerome's motion for summary judgment, (Docket No. 77), is **granted in part and denied in part**. Jerome's motion for summary judgment based upon its argument that no contract was formed is denied. Jerome's motion for summary judgment as to RedPrairie's unjust enrichment claim is denied. Jerome's motion for summary judgment as to RedPrairie's tortious inference claims is **granted**.

A telephone status conference is scheduled for **October 18, 2007** at **9:00 a.m.**, at which

17
Case 2:05-cv-01072-AEG    Filed 09/26/07    Page 17 of 18    Document 137

time the court will discuss further proceedings in this case. The court will place the call.

Dated at Milwaukee, Wisconsin this 26th day of September, 2007.

s/AARON E. GOODSTEIN  
U.S. Magistrate Judge